UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:15-CV-00859-RGJ

**DEREK RENE EDMONDS**                                                    **PETITIONER**

**VS.**

**SCOTT JORDAN,** *Warden*                                          **RESPONDENT**

FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND RECOMMENDATION

Derek Rene Edmonds ("Edmonds") is a Kentucky state prisoner serving a life sentence for his role in the 2004 murder, robbery, and sodomy of a homeless man named Clifton Agnew. Edmonds filed a 28 U.S.C. § 2254 habeas petition on November 30, 2015. (DN 1). This Court denied the first four claims in Edmonds' petition as precluded by the "law of the case" doctrine. (*See* DN 21; DN 25). On appeal, the Sixth Circuit reversed and remanded Edmonds' first four claims to the district court to be assessed on the merits. (DN 37). This Court on remand appointed counsel for Edmonds (DN 46) and adopted the proposed briefing schedule of the parties (DN 65).

Edmonds has now filed a brief in support of his habeas petition, which narrows his request for relief to two claims. (DN 67) Respondent Scott Jordan ("Warden") has responded (DN 72). Edmonds has replied (DN 76). This matter has been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) for findings of fact and a recommendation for disposition. (DN 58).

1

## I. Findings of Fact

### A. Pretrial and Trial Facts

The convictions for which Edmonds seeks relief arise from a fatal attack on Clifton Agnew, a homeless man, in the early morning hours of April 6, 2004. The Kentucky Supreme Court made the following factual findings regarding the events surrounding Agnew's death.

While sleeping in an alley behind the Salvation Army in Louisville, Kentucky, Clifton Agnew was "beaten, hit with a crock pot, stabbed in the leg, and robbed." *Edmonds v. Commonwealth*, No. 2007-SC-000350-MR, 2009 WL 4263142, at *1 (Ky. Nov. 25, 2009) (hereinafter *Edmonds I*). Agnew was sodomized with a bottle and two sticks, resulting in the piercing of his abdomen and organs. *Id.* Law enforcement witnessed an individual fleeing the scene but were unable to apprehend the suspect. *Id.* Officers then discovered Agnew bleeding from his head and rectum. *Id.* EMS transported Agnew to the hospital, where he remained unresponsive and comatose for several weeks until his death. *Id.*

The same day as the attack, Derek Edmonds and Tyreese Hall were separately arrested. *Id.* Hall had a swollen hand and blood spatters on his pants. Edmonds' pants and boots were blood soaked. *Id.* The blood on Hall and Edmonds' clothing matched Agnew's DNA profile. *Id.* The police recovered several items from the alley, including a twenty-seven inch stick and a fifteen-inch stick covered in the victim's blood; a broken beer bottle with blood on the neck; a knife; and a crock-pot which was dented, broken, and bloody. *Id.*

Hall made inconsistent statements to law enforcement regarding his and Edmonds' involvement in the attack on Agnew. Shortly after he was arrested, Hall admitted to striking Agnew with a crock-pot, punching him, and stabbing him in the leg with a knife. *Id.* Officers recorded this

2

statement, and the Commonwealth later played it at trial. Hall also signed a statement, confessing that "he alone robbed and sodomized [Agnew]" and that Edmonds had only kicked the victim before running away. *Id.*

Hall gave a later statement by phone to law enforcement where he implicated Edmonds' brother, Dewayne, in the attack. *Id.* During this call, Hall admitted to throwing the crock-pot and hitting Agnew's head but stated that Edmonds sodomized Agnew with a glass bottle. *Id.* Law enforcement also recorded this statement, and the Commonwealth played it at trial. *Id.*

Hall and Edmonds were tried jointly before a jury in Jefferson County Circuit Court.   The roles and involvement of Hall and Edmonds in the attack on Agnew were a main issue at trial. Hall testified to the following version of events:

> He claimed that Edmonds had been discussing robbing someone that day. Hall, Edmonds, and Edmonds' brother were walking down an alley on the day of the crime when a homeless man awoke and rose up. Hall testified that the man was reaching for something, so he attacked, punching the man in the face and knocking him down. He claimed he kicked the man and then picked up a crock pot and threw it down on the victim's leg so hard that the crock pot broke. Edmonds' brother picked up the victim's wallet, threw it down, and then left the alley. Edmonds then started punching and kicking the victim. Hall testified that he walked away and came back several times, eventually asking Edmonds to stop. At that point, the victim was unconscious. Hall claimed he then saw Edmonds drag the unconscious victim through the gate in a fence, beat him some more, and that he heard Edmonds say, "I'm going to do him like they did our people back in the day," which Hall claimed referred "to racial stuff." He testified that Edmonds then repeatedly sodomized the victim with a stick for about two minutes.

*Id.* Hall testified that his written pretrial statement to police did not implicate Edmonds in the attack because Edmonds was pressuring him to take the blame. *Id.* Hall also stated that he only implicated Dewayne, Edmonds' brother, in his phone call with law enforcement "to get back at Edmonds[.]" *Id.*

Edmonds, on the other hand, denied having any involvement in harming Agnew when

3

being interviewed by police. *Id.* at *2. Edmonds did not testify at trial but presented multiple witnesses in his defense. Mark Murray and James Ford testified that they heard Hall admit to committing the crimes, specifically to robbing Agnew, sodomizing him with a bottle and stick, and hitting him in the head with a crock-pot. *Id*. Two individuals who shared a holding cell with Hall also testified. *Id.* The first stated that Hall claimed all Edmonds had done was "come to Hall's rescue after the victim grabbed Hall, kicking the victim several times to get him off Hall." *Id.* The other testified that Hall "had impliedly admitted to sodomizing the victim with a stick and hitting him in the head with the crockpot." *Id.*

During trial, Agnew's doctor and the medical examiner testified about the extent of Agnew's injuries. *Id.* Dr. Smock testified that upon arrival in the emergency room, Agnew "was bleeding from several sites in his head, had two stab wounds in his leg, and had 'very significant intra-abdominal injuries' and a large amount of blood coming from his rectum." *Id.* Dr. Smock stated that "[s]ome object had been inserted forcefully into [Agnew's] rectum and beyond that into the abdominal cavity and beyond that up into the left lung area" at least twice. *Id.* He used a chart to describe the injuries, demonstrated how long the stick was, and presented eight photographs of Agnew when he was admitted to the hospital showing injuries to his face, eyes, ear, and anus. *Id.* The medical examiner that performed Agnew's autopsy testified that his cause of death was "the head injury he sustained when he was assaulted," with a contributing factor of loss of blood from the extensive injuries in his abdomen and chest. *Id.*

Edmonds and Hall were both convicted. *Id.* Edmonds, receiving the harsher punishment, was sentenced to life without the benefit of parole or probation on the murder charge, life without parole on the sodomy charge, and twenty years on the robbery charge. *Id.* Hall was sentenced to

4

life without the benefit of parole or probation for twenty-five years on the murder charge, twenty-five years on the sodomy charge, and twenty years on the robbery charge. *Id.*

### B. Procedural Facts

Edmonds and Hall appealed their convictions to the Kentucky Supreme Court. In their separate appellate briefs, both Edmonds and Hall challenged the humanizing/victim-impact testimony presented at trial by Kaye Thomas and the hearsay testimony of eyewitness Larry Milligan, among other claims. *Id.* at *2-6. The Kentucky Supreme Court affirmed their convictions in a divided opinion.[1] *Id.* at *19.

Edmonds and Hall filed separate post-conviction motions. Hall filed his federal habeas petition, pursuant to 28 U.S.C. § 2254, on July 19, 2011. *Hall v. Beckstrom*, 3:11-CV-00404-JGH, DN 1, (W.D. Ky. July 19, 2011). The assigned magistrate judge recommended that Hall's petition be denied with prejudice, and the district judge adopted this recommendation in full. *Id.* at DN 14; DN 18; *see also Hall v. Beckstrom*, 3:11-CV-00404-JGH, 2012 WL 4483816 (W.D. Ky. Sept. 28, 2012). The district judge later granted a certificate of appealability on five of Hall's claims. *Id.* at DN 23 (Jan. 3, 2013). The Sixth Circuit affirmed the district court's denial of Hall's habeas petition. *Hall v. Beckstrom*, 563 F. App'x 338 (6th Cir. Apr. 15, 2014).

Edmonds, in the meantime, filed a state post-conviction motion under Kentucky Rule of Criminal Procedure 11.42. (DN 15-1, at PageID # 595-603). The trial court summarily denied Edmonds' motion (*id.* at PageID # 622-623), and the Kentucky Court of Appeals affirmed (*Edmonds v. Commonwealth*, No. 2013-CA-001467-MR, 2015 WL 865440 (Ky. Ct. App. Feb. 27,

---

1  The Kentucky Supreme Court remanded for the limited purpose of entry of an amended judgment for Edmonds' sentence for first-degree sodomy because he received a life sentence rather than a sentence of life without parole. *Edmonds I*, 2009 WL 4263142, at *19.

2015) (hereinafter *Edmonds II*). The Kentucky Supreme Court declined to entertain discretionary review of Edmonds' motion. (DN 15-1, at PageID # 696). Edmonds did not seek certiorari at the United States Supreme Court.

Edmonds filed his 28 U.S.C. § 2254 federal habeas petition on November 30, 2015, asserting eight constitutional claims. (DN 1). Relevant here are Edmonds' first four claims, asserting his due process rights were violated: (1) when the trial court limited *voir dire*; (2) when it failed to strike certain jurors for cause; (3) when it allowed prejudicial guilt-phase victim testimony from Kaye Thomas; and (4) when it instructed the jury not to consider Larry Milligan's eyewitness testimony, which failed to identify Edmonds. (*Id.*). The assigned magistrate judge recommended that Edmonds' petition be denied and specifically found Edmonds' first four claims were precluded by "law of the case doctrine." (DN 21). Over Edmonds' objections, the district judge adopted the magistrate judge's recommendation in full and denied Edmonds a certificate of appealability. (DN 25).

The Sixth Circuit granted a certificate of appealability on several of Edmonds' claims, including his four due process claims, and appointed Edmonds counsel. (DN 36). The Sixth Circuit reversed the district court's denial of habeas relief, holding that "the law-of-the-case doctrine does not apply across separate habeas actions brought independently by petitioners who were codefendants in the underlying criminal proceeding." *Edmonds v. Smith*, 922 F.3d 737 (6th Cir. 2019) (hereinafter *Edmonds III*). The decision in Hall's habeas proceeding, therefore, could not be used to preclude relief in Edmonds' case. *Id.*

The Sixth Circuit's Opinion instructed the district court on remand to "obtain the entire state record and assess [Edmonds'] claims on the merits. *Id.* at 741. The appellate court also

6

addressed the proper standard of review for each of Edmonds' claims on remand, directing the district court to apply AEDPA's deferential review to Edmonds' *voir dire* and for-cause-strike claims, to apply de novo review to his claim regarding the exclusion of eyewitness testimony, and to determine in the first instance which standard of review applies to his victim-impact-testimony claim. *Id.*

The District Judge appointed Edmonds counsel and set a briefing schedule. (DN 42; DN 65). Edmonds' brief in support of his petition only addresses his eyewitness testimony and victim-impact testimony claims. He asserts that both claims are subject to de novo review. (DN 67). The Warden's response brief claims, for the first time during this five-year habeas action, that Edmonds' claims must be dismissed because he did not exhaust them in his direct appeal to the Kentucky Supreme Court. (DN 72, at PageID # 1334). If not dismissed for failure to exhaust, the Warden submits that Edmonds' victim-impact-testimony claim should be reviewed under AEDPA's deferential standard. (*Id.* at PageID # 1337).

## II. Conclusions of Law

As an initial matter, Edmonds did not address either his *voir dire* or for-cause-strike claims in his brief to this Court on remand. And, in his reply, Edmonds did not object to the Warden's assertion that he abandoned these claims. This Court, accordingly, recommends Edmonds' *voir dire* and for-cause-strike claims be deemed waived. The remainder of this Report and Recommendation will address only Edmonds' victim-impact-testimony and eyewitness-testimony claims.

### A. Procedural Default

The Warden preliminarily asserts that Edmonds' two remaining claims should be dismissed

because Edmonds failed to exhaust them in state court. (DN 72, at Page ID # 1334-37). According to the Warden, Edmonds did not fully and fairly present his constitutional claims to the Kentucky Supreme Court because his brief only generally cited to violations of due process and of the 5th and 14th Amendments to the United States Constitution. (*Id.*). Otherwise, the Warden points out, Edmonds' briefing of these arguments relied strictly on Kentucky case law. (*Id.*). The Warden submits that Edmonds' general references to due process were insufficient to alert the Kentucky Supreme Court that he was asserting his constitutional rights were violated. (*Id.*).

Edmonds replies that the Warden has waived any exhaustion defense through words and conduct. (DN 76, at PageID # 1382). Edmonds explains the Warden expressly waived its exhaustion defense in his answer to Edmonds' original habeas petition five years ago. (*Id.* at PageID # 1382-83). And, Edmonds continues, the Warden impliedly waived exhaustion by declining to challenge the characterization of this waiver in briefing before the Sixth Circuit and by previously making contradictory arguments. (*Id.* at PageID # 1383-84). Edmonds further claims the Sixth Circuit's mandate forecloses any exhaustion defense by instructing the District Court to consider Edmonds' claims on the merits. (*Id.* at PageID # 1387-88). Even if the Warden didn't waive his exhaustion defense, Edmonds maintains that his brief to the Kentucky Supreme Court fully and fairly presented his constitutional claims. (*Id.* at PageID # 1388-92).

A state prisoner must exhaust available state remedies before seeking a federal writ of habeas corpus. 28 U.S.C. § 2254(b)(1)(A). This exhaustion requirement gives the state the chance to "'pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted). To ensure that state courts have this opportunity, the prisoner must "fairly present" his claims in each appropriate state court, thereby alerting the court

to the federal nature of the claim. *Id.* A claim is only considered "fairly presented" if the prisoner asserted both the factual and legal basis for his claim to the state courts. *McMeans v. Brigano*, 228 F.3d 674 , 681 (6th Cir. 2000) (citing *Franklin v. Rose,* 811 F.2d 322, 324–25 (6th Cir.1987)).

Under AEDPA, however, the state may expressly waive the exhaustion requirement. 28 U.S.C. § 2254(b)(1). AEDPA does not identify "magic words" necessary for a state to expressly waive exhaustion. *D'Ambrosio v. Bagley*, 527 F.3d 489, 497 (6th Cir. 2008). Rather, the benchmark for determining whether a waiver is express is the "clarity of the intent to waive" or, stated otherwise, whether the party "intentionally gave up [his] right to raise exhaustion." *Id.*; *see also Pirkel v. Burton*, 970 F.3d 684, 693 n.2 (6th Cir. 2020) (noting that other circuits have held that "a state's concession of exhaustion before the district court is an express waiver of the exhaustion requirement under § 2254(b)(3)").

While some question exists as to whether Edmonds fairly presented his claims to the Kentucky Supreme Court because he only generally referenced due process and the 5th and 14th Amendments to the Constitution in his brief (*see* DN 15-1, at PageID # 400, 403), the Court need not further analyze this issue here because the Warden has expressly waived the exhaustion requirement. The Warden's Answer to Edmonds' original habeas petition included a section titled "Exhaustion." (DN 15, at PageID # 103). There, the Warden noted that Edmonds' seventh claim, whether the trial court prevented him from testifying in his own defense, is barred by a failure to exhaust. (*Id.*). The Warden then specified that he was "not arguing that any of the other claims are unexhausted." (*Id.*). In the next section, titled "Procedural Default," the Warden again indicated that other than Edmonds' seventh claim, he was "not arguing that any of Edmonds' habeas claims are barred by procedural default." (*Id.*). These statements manifest Edmonds' clear and

unambiguous intent to give up his right to raise exhaustion. *D'Ambrosio*, 527 F.3d at 497 (finding that respondent was not required to verbally state that he was waiving the exhaustion requirement to expressly waive exhaustion); *see also Pirkel*, 970 F.3d at 693 n.2 (stating that the court had concerns that the respondent waived its exhaustion defense where respondent stated in its answer to petitioner's habeas petition that petitioner "raised the instant claims on direct appeal and, therefore, exhausted his state remedies").

What's more, over two years later in his brief to the Sixth Circuit, Edmonds highlighted that the Warden previously acknowledged in his Answer that Edmonds' claims were not subject to procedural bars. DN 20, No. 17-5982 (6th Cir. Aug. 1, 2018). The Warden did not challenge or rebut this statement in his response brief. *See* DN 24, No. 17-5982 (6th Cir. Oct. 23, 2018). The Warden also made several arguments in his appellate brief that contradict his newly asserted exhaustion defense. For instance, the Warden argued that the Kentucky Supreme Court had not overlooked Edmonds' due process claim regarding Thomas' testimony but, instead, considered and rejected Edmonds' federal constitutional argument. (*See id.* at pp. 34-35). And, as to Edmonds' due process claim regarding the exclusion of Milligan's testimony, the Warden seems to concede its constitutional component by applying *Chambers v. Mississippi*, 410 U.S. 284 (1973). (*Id.* at pp. 26-28). The Warden's arguments on appeal bolster his clear intent to waive the exhaustion requirement.

The Warden's late assertion of exhaustion as a procedural bar also frustrates the Sixth Circuit's mandate. An appellate court's remand directing a specific, narrow course of action is fairly considered a limited remand. *United States v. O'Dell*, 320 F.3d 674, 680-81 (6th Cir. 2003). When an appellate court issues a limited remand, "[t]he mandate rule 'compels compliance on

remand with the dictates of the superior court . . ." *Id.* District courts are "bound to the scope of the remand issued by the court of appeals," *United States v. Campbell*, 168 F.3d 263, 265 (6th Cir. 1999), and must implement "both the letter and spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces." *O'Dell*, 320 F.3d at 680 (citing *Campbell*, 168 F.3d at 266).

The Sixth Circuit's Opinion specifically reversed and remanded Edmonds' four claims to the district court "to obtain the entire state court record and assess those claims on the merits." (DN 37, at PageID # 844). The Opinion further directs the district court on remand to apply AEDPA's deferential review to Edmonds' *voir dire* and for-cause-strike claims, to apply de novo review to his claim regarding the exclusion of eyewitness testimony, and to determine in the first instance which standard of review applies to his victim-impact testimony claim. (*Id.*). This narrow course of action constitutes a limited remand. And while the appellate court's limited remand does not explicitly state that the district court could not consider additional procedural bars, the letter and the spirit of the mandate and the decision as a whole support a merits review of Edmonds' remaining claims.

As a final consideration, the Court notes there is some debate over a court *sua sponte* raising a procedural bar. In *Lovins v. Parker,* the Sixth Circuit stated that even when a state waives a procedural default defense, district courts are permitted, but not obligated, to raise *sua sponte* the procedural bar. 712 F.3d 283 (6th Cir. 2013); *see also Day v. McDonough*, 547 U.S. 198, 210 (2006) (holding that AEDPA's statute of limitations, like the doctrines of exhaustion and procedural default, may be raised by the district court *sua sponte*). Very recently, however, in *Miller v. Genovese*, the Sixth Circuit commented that "[w]hen the state makes an 'explicit and

deliberate waiver' of a procedural default defense, we cannot revisit the issue." 994 F.3d 734, 740-41 n. 2 (6th Cir. 2021) (quoting *Maslonka v. Hoffner*, 900 F.3d 269, 276 n.1 (6th Cir. 2018)). The Court declines to raise exhaustion *sua sponte* here because the waiver determination is not a close call, because this decision aligns with the Sixth Circuit's mandate, and because the Warden previously asserted arguments contrary to its newly asserted exhaustion argument. Based on this discussion, the Court will proceed to merits evaluation of Edmonds' two remaining claims.

### B. Edmonds' Victim-Impact-Testimony Claim

#### i. Standard of Review

As discussed above, the Sixth Circuit directed this Court, in the first instance, to determine which standard of review applies to Edmonds' victim-impact-testimony claim. Edmonds argues that de novo review applies; whereas, the Warden maintains that AEDPA's deferential review governs.

The AEDPA requires that when a state prisoner's habeas claims were "adjudicated on the merits in State court proceedings[,]" the state's decision is subject to significant deference. *See, e.g., Harrington v. Richter*, 562 U.S. 86, 101 (2011). For a federal court to grant relief in such a case, the state court's decision must have:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

As to § 2254(d)(1), when the state court articulates the correct legal rule in its review of a claim, a "federal habeas court may not issue the writ simply because that court concludes in its

12

independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor*, 529 U.S. 362, 411 (2000); *see also Tolliver v. Sheets*, 594 F.3d 900, 916 (6th Cir. 2010). Instead, the Court must ask "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams,* 529 U.S. at 409. The phrase "contrary to" means "'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" *Id.* at 405 (citing Webster's Third New International Dictionary 495 (1976)). Thus, under the "contrary to" clause of § 2254(d)(1), the Court may grant the petition if (a) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; **or** (b) the state court decides a case differently than the Supreme Court "has on a set of materially indistinguishable facts." *Id.* at 405-06, 412-13.

As to § 2254(d)(2), a federal habeas court may not substitute its evaluation of the state evidentiary record for that of the state trial court unless the state determination is unreasonable. *Rice v. Collins*, 546 U.S. 333, 341-42 (2006). A federal court must assess whether the state court's decision was unreasonable in light of the record that was before the state court. *Cullen v. Pinholster*, 563 U.S. 170 (2011). This subsection applies when a petitioner challenges the factual determinations made by the state court. *See, e.g., Mitzel v. Tate*, 267 F.3d 524, 537 (6th Cir. 2001) (challenging the state court's determination that the evidence did not support an aiding and abetting suicide instruction); *Clark v. O'Dea*, 257 F.3d 498, 506 (6th Cir. 2001) (challenge to state court's factual determination that Sheriff has not seen letter prior to Clark's trial).

But when a petitioner's claim was never "adjudicated on the merits" by a state court, AEDPA's deferential standard no longer applies, and the claim is reviewed *de novo*, as it would be on direct appeal. *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (citing *Maples v. Stegall*,

340 F.3d 433, 436 (6th Cir. 2003)). In *Harrington v. Richter*, the Supreme Court held that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be *presumed* that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." 562 U.S. 86, 99 (2011) (emphasis added). This presumption applies even where the state court summarily rejects all of the claims without explaining its reasoning. *Id.* at 784. The Supreme Court extended the *Harrington* presumption in *Johnson v. Williams* to instances where the state court rules against the defendant in an opinion that addresses some issues but did not expressly address the federal claim in question. 568 U.S. 289, 301 (2013). The *Johnson* Court held "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court may presume that the federal claim was adjudicated on the merits." *Id.*

The Sixth Circuit has applied *Harrington's* presumption to when a state court "imperfectly discusses, rather than omits, a petitioner's federal claim." *Smith v. Cook*, 956 F.3d 377, 386 (6th Cir. 2020) (citing *McKinney v. Hoffner*, 830 F.3d 363, 368-60 (6th Cir. 2016)). Courts in other circuits have similarly applied *Harrington's* presumption of AEDPA deference despite the state court not "show[ing] its work," *Lee v. Comm'r, Ala. Dep't of Corrs.*, 726 F.3d 1172, 1211 (11th Cir. 2013), or not "describ[ing] [the] claim in precisely the manner [the petitioner] preferred," *Miller v. Thaler*, 714 F.3d 897, 901 n.3 (5th Cir. 2013).

The *Harrington/Johnson* presumption may only be rebutted in "limited circumstances." *Smith*, 956 F.3d at 386 (quoting *Johnson*, 568 U.S. at 301). To overcome the presumption, the petitioner typically must show that the state court "overlooked" the claim and "rejected [it] as a result of sheer inadvertence." *Johnson*, 568 U.S. at 302-03. This is because a claim that has been

inadvertently overlooked "has not been evaluated on the intrinsic right and wrong of the matter." *Id.*

Edmonds argues that de novo review applies to his victim-impact-testimony claim. He claims he overcomes the *Harrington/Johnson* presumption because the Kentucky Supreme Court inadvertently overlooked this federal claim. (DN 76, at PageID # 1394). He explains that the state court did not adjudicate or consider his federal constitutional claim but instead decided the state law claim specifically under Kentucky law. (DN 67, at PageID # 1146). Edmonds also claims that in co-defendant Hall's habeas appeal, the Sixth Circuit strongly suggested de novo review of Hall's nearly identical claim was appropriate. Lastly, Edmonds argues that if the Court decides the state court resolved his constitutional claim on the merits, de novo review is still the proper standard because the state court's decision was contrary to or involved an unreasonable application of *Payne v. Tennessee, Chambers v. Mississippi,* and *Booth v. Maryland* and rested on an unreasonable determination of facts. (*Id.* at PageID # 1148).

The Warden responds that the Kentucky Supreme Court adjudicated Edmonds' victim-impact-testimony claim on the merits and that AEDPA review is proper based on *Harrington.* (DN 72, at PageID # 1337). The Warden asserts that the plain reading of the Kentucky Supreme Court's majority and dissenting opinions demonstrates that the erroneous admission of Thomas' victim-impact testimony was not constitutional in nature but was an error of state procedural and evidentiary law. (*Id.* at PageID # 1339-40). The agreement between the majority and dissent, the Warden claims, shows that the Kentucky Supreme Court did not overlook Edmonds' due process argument or fail to address it. (*Id.* at PageID # 1340). Rather, the Warden concludes that the Kentucky Supreme Court's silence on the constitutional dimension of Edmonds' claim is

tantamount to a consideration and rejection of such argument. (*Id.*).

The Kentucky Supreme Court applied Kentucky law to find that "[t]he portions of Thomas's testimony that exceeded permissible humanizing evidence were error." *Edmonds I*, 2009 WL 4263142, at *5. The court then set forth the applicable standard for harmless error review: "A non-constitutional evidentiary error must have a substantial influence on the jury's verdict to require reversal." *Id.* (quoting *Winstead v. Commonwealth,* 283 S.W.3d 678, 688–89 (Ky.2009) (citing *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). The court concluded that the introduction of Thomas' improper victim-impact testimony was harmless pursuant to Kentucky Rule of Criminal Procedure (RCr) 9.24 because there was overwhelming evidence of Edmonds' guilt, including blood on his clothing, DNA evidence linking the blood to the victim, co-defendant Hall's confession, and co-defendant Hall's testimony at trial implicating both himself and Edmonds. *Id.* Upon "consideration of the whole case," the court determined the improper victim-impact testimony did not have a substantial influence on the jury's verdict. *Id.*

The threshold question is whether Edmonds has overcome the *Harrington/Johnson* presumption that the Kentucky Supreme Court adjudicated his federal claim on the merits. The Court finds he has not. By concluding that the admission of Thomas' testimony was "non-constitutional evidentiary error" and by applying *Winstead* and *Kotteakos*, the Kentucky Supreme Court considered whether the nature of the error was constitutional. In doing so, the state court implicitly determined that the federal harmless error standard for constitutional errors did not apply to Hall's error but, if it did, that such error would be considered harmless beyond a reasonable doubt. The Kentucky Supreme Court was not required to provide a step-by-step analysis for

16

rejecting Edmonds' constitutional claim for it to be considered a merits adjudication.[2]

The Sixth Circuit's decision in Hall's habeas case supports this determination. There, the court stated that "this is not a case where the court decided Hall's claim and provided no explanation; the court decided Hall's claim and did so specifically under Kentucky law." *Hall*, 563 F. App'x at 358-59. The Sixth Circuit did not equivocally state that de novo review was appropriate; instead, it stated twice that "even under de novo review," habeas relief was not warranted on Hall's victim-impact-testimony claim. *Id.* The Sixth Circuit's analysis in *Hall*, therefore, does not compel de novo review of Edmonds' claim regarding Thomas' victim-impact testimony.

While Edmonds would have preferred the state court to "show its work" or to articulate each step in its reasoning, Edmonds has not demonstrated that his claim was either inadvertently overlooked or outright ignored. *See Cook*, 956 F.3d at 387. For these reasons, the Court applies AEDPA deference to Edmonds' victim-impact-testimony claim.

ii. Factual Background

The Kentucky Supreme Court provided the following facts related to Edmonds' victim-impact-testimony claim. After Agnew was attacked on April 6, 2004, a stranger named Kaye Thomas ("Thomas") saw his story on the news and began visiting a comatose Agnew in the

---

2 In *Jackson v. Litteral*, No. 3:16CV-00091-DJH, 2017 WL 5163251, at *4 (W.D. Ky. May 24, 2017), this Court addressed the Kentucky Supreme Court's application of harmless error to a petitioner's claim of trial error. There, the Court noted that "[a]lthough the Kentucky Supreme Court did not cite to *Chapman v. California*, 386 U.S. 18 (1967), it clearly found the instructional error was harmless beyond a reasonable doubt" because the error did not have "substantial influence" upon the petitioner's trial and did not "substantially sway[]" his conviction. *Id.* (quoting *Jackson v. Commonwealth*, 2010 WL 252244, at *6 (Ky. 2010) (quoting *Winstead*, 283 S.W.3d at 688-89)). The Court applied AEDPA deference to petitioner's claim. This analysis from *Jackson* demonstrates that the state appellate court need not cite to a particular case or use particular language in order for a harmless error claim to have been considered on the merits for purposes of AEDPA review.

hospital. *Edmonds I*, 2009 WL 4263142, at *2. Thomas instituted a national letter writing campaign on Agnew's behalf and, despite never meeting Agnew before his attack, eventually became his legal guardian. *Id.*

Before trial, the state indicated its intent to call Thomas as a "humanizing witness" as allowed under *McQueen v. Commonwealth*, 669 S.W.3d 519 (Ky. 1984). Edmonds sought to exclude Thomas' testimony as irrelevant and highly prejudicial, which the trial court denied. *Id.* Edmonds renewed his objection to Thomas' testimony before she took the stand at trial, specifically taking issue with testimony about the "card campaign" Thomas initiated on Agnew's behalf. *Id.* The court determined that Thomas could testify as a humanizing witness, including how she read Agnew letters and her observations about Agnew's injuries and "pain and suffering as a lay person could." *Id.* But the court forbade testimony from Thomas about the case garnering national attention, that people from around the country sent Agnew letters, and what others did for Agnew, including the "card campaign" and the number of cards Agnew received. *Id.*

When Thomas took the stand on direct examination, she made the following statements regarding the card campaign she initiated:

- She requested her friends send the victim of this "horrific thing" cards "as an act of protest against the violence that had been done to him" and "as an act of kindness to show a man that probably had not had a lot of kindness in his life."

- That on one day, Agnew received 666 cards, so she bought an extra card because she "thought he'd already met the devil once and didn't need to meet him again."

- That Agnew received thousands of cards from all over the world, which she read to him in the hospital.

- That she hoped these cards would connect the sender to Agnew and "somehow miraculously there would be some hope and maybe he would get better."

- That he eventually received 6,286 cards, including correspondence from the University of Louisville baseball team, RCA Records, the Secretary of State of New Jersey, and a Native American tribe.

*Id.* at *3-4. Thomas also made the following observations regarding Agnew's condition in the hospital:

- That Agnew had lost a tremendous amount of weight "because he had lost three-quarters of his stomach" and was on a feeding tube.

- That there was never any reaction from Agnew and he was partially paralyzed.

- That on the day Agnew died, he opened his eyes for the first time and that although his eyes had always been brown, they were "sky blue," which Thomas believed was a good sign.

- That Agnew's organs were "swollen outside of his body" and covered with clear surgical plastic.

*Id.* at *4. Throughout her eighteen minutes of testimony, Thomas "cried softly several times." *Id.* After direct examination, Edmonds' counsel moved for a mistrial. *Id.* The trial court denied this request, finding that there was no prejudice from Thomas' testimony. *Id.*

### iii. The Kentucky Supreme Court's Decision

On appeal, the Kentucky Supreme Court found that Thomas' testimony exceeded the scope of humanizing evidence permissible during the guilt phase of trial. *Edmonds I,* 2009 WL 4263142, at *5. Quoting *Bennett v. Commonwealth*, 978 S.W.2d 322, 325-26 (Ky. 1998), the court explained that much of her testimony was not about Agnew "but was instead about her reaction and the community's response to his plight, i.e. more akin to victim impact testimony." *Id.* The court noted that it was error "to introduce victim impact evidence during the guilt phase of a criminal trial" and concluded that the portions of Thomas' testimony that exceeded permissible humanizing

evidence were error. *Id.*

But because this error did not have a "substantial influence on the jury's verdict," the Kentucky Supreme Court found the error was harmless. *Id.* The court emphasized the overwhelming evidence of Edmonds' guilt, including blood on Edmonds' clothing, DNA evidence linking the blood to Agnew, co-defendant Hall's confession, and co-defendant Hall's testimony at trial implicating both himself and Edmonds. *Id.* The court further noted that "far more graphic evidence" of Agnew's injuries was introduced through medical evidence and photographs shown to the jury than the testimony offered by Thomas. *Id.*

### iv. Edmonds' Claim on Habeas Review

Edmonds now asserts that the introduction of Thomas' victim-impact testimony violated three lines of clearly established Supreme Court precedent: *Payne v. Tennessee*, 501 U.S. 808 (1991), *Chambers v. Mississippi*, 410 U.S. 284 (1973), and *Booth v. Maryland*, 482 U.S. 496 (1987). These violations, Edmonds continues, cannot be considered harmless error under *Brecht v. Abrahamson*, 507 U.S. 619 (1993) because the evidence against Edmonds was "hardly overwhelming" and the prejudice to his verdict was evident as Thomas' testimony encouraged the jury to convict based on outrage and sympathy. (DN 67, at PageID # 1144-45).

Edmonds also asserts that the Kentucky Supreme Court made several "gross factual errors" in its recitation of the facts. (DN 67, at PageID # 1162 n. 8). Specifically, Edmonds accuses the state court of conflating the evidence against co-defendant Hall with the weaker evidence against him, with misstating the strength of the prosecution's forensic evidence, with ignoring evidence favorable to him, with failing to mention the prosecution's reliance on Thomas' testimony at closing, and with incorrectly stating that "far more graphic evidence" of Agnew's condition was

introduced to the jury. (*Id.*).

First, Edmonds claims that Thomas' testimony during the guilt phase of his trial was an unreasonable application of *Payne v. Tennessee,* 501 U.S. 808 (1991). (DN 67, at PageID # 1150). Edmonds maintains that Thomas' inflammatory and irrelevant testimony served no legitimate purpose and was unduly prejudicial because, contrary to the Kentucky Supreme Court's determination, the evidence of his guilt was not overwhelming. (*Id.*). Edmonds emphasizes that Thomas' testimony was far more prejudicial to him than to his co-defendant, since Edmonds maintained his innocence before and throughout the trial; whereas, Hall made several confessions and gave unreliable, conflicting testimony. (*Id.* at PageID # 69-70).

The Warden responds that Edmonds' reliance on *Payne* is misplaced because neither the United States Supreme Court nor the Sixth Circuit have expressly prohibited victim-impact evidence in the guilt phase of trial. (DN 72, at PageID # 1348-1349). The Warden further asserts that Edmonds is impermissibly conducting his own analysis of the evidence presented at trial, including weighing and attacking the credibility of witnesses and of selected parts of the proof presented to the jury. (*Id.* at PageID # 1350).

The inquiry here is two-fold. First, did the Kentucky Supreme Court unreasonably apply *Payne* in finding the introduction of Thomas' testimony was not unduly prejudicial and did not render the trial fundamentally unfair? Second, in concluding the testimony was not unduly prejudicial, did the Kentucky Supreme Court rely on an unreasonable determination of the facts?

The Supreme Court held in *Payne* that "if the State chooses to permit admission of victim impact evidence . . ., the Eighth Amendment erects no *per se* bar." 501 U.S. at 827. *Payne* cautions, however, that such evidence must "serve[] entirely legitimately purposes." *Id.*at 825. And if the

21

victim-impact evidence introduced is "so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause to the Fourteenth Amendment provides a mechanism for relief." *Id.* In analyzing prejudice, reviewing courts consider whether "excessive or prejudicial references to victim-impact evidence" have infected the trial with unfairness. *Beuke v. Houk*, 537 F.3d 618, 649 n. 9 (6th Cir. 2008). Although *Payne* dealt with victim-impact evidence during the sentencing phase of a capital case, the Sixth Circuit has "approved victim impact evidence during the guilt phase . . . as an extension of *Payne.*" *Hicks v. Collins*, 384 F.3d 204, 222 (6th Cir. 2004).

The Kentucky Supreme Court's decision was not an unreasonable application of *Payne.* Although the relevance of Thomas' testimony was minimal, her testimony was not unduly prejudicial. Thomas' eighteen minutes of testimony, and the state's brief reference to such testimony during closing arguments, was not "excessive" in the context of Edmonds' weeks-long trial. Moreover, certain portions of Thomas' testimony, such as her statement that Agnew "had already met the devil once," while inflammatory, were not specifically directed at Edmonds. It was not unreasonable for the Kentucky Supreme Court to conclude that Thomas' relatively brief testimony did not infect the trial with unfairness. This conclusion further compels that even if Edmonds could establish a constitutional violation, such error would be harmless, pursuant to *Brecht v. Abrahamson,* because introduction of such evidence did not have a substantial and injurious effect or influence in determining the jury's verdict.

Nor does the undersigned find that the Kentucky Supreme Court's determination rested on an unreasonable determination of the facts. The Kentucky Supreme Court described the evidence of Edmonds' and Hall's guilt as overwhelming: including blood on the Appellants' clothing, DNA evidence linking the blood to Agnew, Hall's confession, and Hall's testimony at trial implicating

both himself and Edmonds. *Edmonds I*, 2009 WL 4263142, at *5. Edmonds makes much of the Kentucky Supreme Court's reference to Hall's confession and testimony at trial, emphasizing that, unlike Hall, Edmonds maintained his innocence and never confessed, making the evidence against him "vastly weaker." (DN 67, at PageID # 1162).

At their joint trial, both defendants claimed they were minimally involved in the attack on Agnew and that the other was the primary attacker. Hall gave several written and oral statements to law enforcement before trial regarding his role in the attack. During one of these statements, Hall confessed to being the primary attacker. Hall testified under oath at trial and was vigorously cross-examined. Hall testified that he offered his pre-trial confession because Edmonds pressured him to take the blame. While Edmonds did not testify at trial, he called several witnesses to impeach Hall's testimony. The blood on both defendants' clothing and the DNA evidence linking the blood to Agnew, was incriminating for both Edmonds and Hall. Based on this information, the Court cannot say that the Kentucky Supreme Court's description of the evidence against Edmonds was unreasonable. The jury had ample evidence that implicated both Edmonds and Hall from which to determine the credibility of Hall's testimony and to otherwise determine Edmonds' and Hall's roles in the attack.

The Court likewise does not find the Kentucky Supreme Court's statement that "far more graphic evidence of [Agnew's] injuries was introduced through medical testimony and photographs shown to the jury" than Thomas' testimony regarding Agnew's injuries, was unreasonable. Thomas testified only briefly regarding her observations of Agnew in the hospital. She indicated he had lost three-quarters of his stomach, was on a feeding tube, that he was partially paralyzed, that he never gave any reaction, that his organs were swollen outside of his body and

23

covered with clear surgical plastic, and that he opened his eyes on the day he died and his eye color changed from brown to blue. Whereas, Dr. Smock, Agnew's physician in the emergency room, testified at length about the nature and extent of Agnew's injuries and used several graphic photographs of Agnew from the date of his admission at the hospital. Dr. Burrows-Beckham, the medical examiner who performed Agnew's autopsy, testified as to Agnew's cause of death and injuries. It was not unreasonable for the Kentucky Supreme Court to conclude that this testimony, offered by medical professionals, was "far more graphic" than the personal observations of Thomas, a lay witness.

Next, Edmonds argues that the Kentucky Supreme Court erroneously admitted Thomas' testimony under state law, which violates the due process clause, pursuant to *Chambers v. Mississippi*. (DN 67, at PageID # 1166). Edmonds believes the trial court's admission of Thomas' testimony was "so egregious" that it "result[ed] in a denial of fundamental fairness."   (*Id.* (citing *Chambers*, 410 U.S. at 302-03; *Ege v. Yukins*, 485 F.3d 364, 375 (6th Cir. 2007)). The Warden argues that Edmonds cannot meet the very deferential standard imposed by the due process clause in *Chambers* because of the substantial evidence of Edmonds' guilt and involvement in the crime. (DN 72, at PageID # 1353-54).

In *Chambers*, the Supreme Court reviewed a state court's erroneous exclusion of hearsay testimony and found the state court's mechanistic application of the hearsay rule "defeat[ed] the ends of justice" because constitutional rights directly affecting the ascertainment of guilt were implicated. 410 U.S. at 302-03. The Supreme Court later, in *Montana v. Egelhoff*, noted that *Chambers'* holding is extremely limited:

> *Chambers* was an exercise in highly case-specific error correction . . . Thus, the holding of *Chambers* – if one can be discerned from such a fact-intensive case – is

certainly not that a defendant is denied "a fair opportunity to defend against the State's accusations" whenever "critical evidence favorable to him is excluded, but rather that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation.

518 U.S. 37, 52-53 (1996). The Sixth Circuit has applied *Chambers* to conclude that "due process is violated, and thus habeas relief warranted, only if an evidentiary ruling is 'so egregious that it results in a denial of fundamental fairness.'" *Ege v. Yukins*, 485 F.3d 364, 375 (6th Cir. 2007) (quoting *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003)). Whether a denial of fundamental fairness has occurred "turns on whether the evidence is material in the sense of a crucial, critical, highly significant factor." *Id.* (quoting *Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000)).

Here, it was not objectively unreasonable for the Kentucky Supreme Court to conclude that the admission Thomas's testimony, under the tenets of *Chambers*, was not prejudicial. Thomas' brief testimony, that did not specifically reference Edmonds, is not the type of crucial or critical evidence contemplated in *Ege*. In *Ege*, the Sixth Circuit found in the petitioner's favor, where the only physical evidence against the defendant was a bite mark and the remainder of the evidence was circumstantial, did not place defendant at the scene of the crime, and was nine years old by the time defendant was charged. *Id.* at 376. The evidence in Edmonds' case is distinguishable from *Ege.* Again, DNA evidence from the victim linked Edmonds to the crime scene and testimonial evidence established Edmonds' presence at the crime scene. In light of this evidence, the Court cannot say that admission of Thomas' improper victim-impact testimony was so egregious that it denied Edmonds fundamental fairness in violation of due process.

Edmonds next argues that Thomas' testimony unambiguously violated *Booth v. Maryland*, because she referred to Edmonds as the devil, described the crime as "horrific," and characterized her card campaign as a protest against the violence that had been done to Agnew. (DN 67, at

PageID # 1169-70). This emotionally charged testimony during the guilt-phase of trial, Edmonds reasons, "strongly suggests that the *Booth* error had a substantial and injurious impact on the jury's verdict." (*Id.* at PageID # 1170). The Warden did not separately address Edmonds' *Booth* claim but indicated this claim was repetitive of Edmonds' claims regarding *Payne* and *Chambers*. (DN 72, at PageID # 1346-47).

In *Booth*, the Supreme Court held that introduction of victim-impact testimony to a jury during sentencing at a capital murder trial violated the Eighth Amendment. 482 U.S. 496 (1987). Two types of victim-impact evidence were presented in *Booth*: (1) statements about the victim's personal characteristics" and the emotional impact of the crime on the victim's family; and (2) the victim's family's opinions about the crime, the defendant, and the appropriate sentence. *Id.* at 508. *Booth* held that both types of evidence are "irrelevant to a capital sentencing decision" and "create[] a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." *Id.* at 502-03.

Four years later, in *Payne*, the Supreme Court revised its holding in *Booth*, to find there is no per se bar against the first type of evidence: description of the victim and effects on the victim's family. 501 U.S. at 827. The *Payne* Court specifically noted, however, that its holding did not disturb *Booth's* rule that "admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment." *Id.* at 830 n.2.

The applicability of *Booth* here is questionable because *Booth* applies to the sentencing phase of a capital trial. Clearly established federal law at the time Edmonds' conviction became final prohibited, at most, victim-impact testimony during the *sentencing* phase of a capital trial –

not evidence presented during the guilt phase of the trial. The Supreme Court's silence on a given issue does not create "clearly established federal law." Accordingly, there was not any "clearly established federal law" for the Kentucky Supreme court to contravene or unreasonably apply to Thomas' victim-impact testimony during the guilt phase.[3]

Given the absence of a clear directive from the United States Supreme Court or from the Sixth Circuit regarding the admission of the type of victim-impact evidence prohibited by *Booth*, the Court treats Edmonds' *Booth* claim as any other alleged state evidentiary error. As this Court has already noted in addressing Edmonds' claim under *Payne* and *Chapman*, the due process clause prohibits evidence that is so unduly prejudicial that the trial is fundamentally unfair. For the same reasons previously discussed, Thomas' inappropriate victim-impact testimony was not pervasive and did not infect the trial with unfairness. Accordingly, habeas relief is not warranted as to Edmonds' victim-impact-testimony claim.

### C. Edmonds' Witness-Identification Claim

#### i. Standard of Review

In its opinion remanding Edmonds' habeas petition, the Sixth Circuit indicated that Edmonds' claim regarding the exclusion of Larry Milligan's testimony should be analyzed de novo. *Edmonds III*, 922. F.3d at 741.

#### ii. Factual Background

The Kentucky Supreme Court provided the following facts related to Edmonds' witness-

---

3 As discussed above, the Sixth Circuit has expressly applied *Payne* to claims involving victim-impact testimony to the guilt phase in capital cases. *See Hicks v. Collins*, 384 F.3d 204, 222 (6th Cir. 2004). The Court finds no comparable Sixth Circuit precedent that extends the holding in *Booth* to victim-impact testimony from the guilt phase at capital trials. Even if Sixth Circuit precedent had extended *Booth's* holding, such case law would not constitute "clearly established federal law" as required by the AEDPA.

identification claim. On the morning that Agnew was attacked, an eyewitness to the crime, Larry Milligan ("Milligan"), identified Hall in a photo lineup as one of the men involved. *Edmonds I*, 2009 WL 4263142, at *6. Milligan did not identify Edmonds. *Id.* Shortly thereafter, Milligan disappeared and could not be located. *Id.* Edmonds attempted to introduce Milligan's non-identification at trial to support his theory of innocence and to contradict testimony offered that he was the main perpetrator. *Id.* Co-defendant Hall filed a pretrial motion in limine to exclude the evidence. *Id.* The trial court granted Hall's motion and excluded Milligan's photo-array identification statements as hearsay and violative of the confrontation clause. *Id.* Despite this pretrial ruling, Milligan's hearsay statements identifying Hall were mentioned several times throughout the trial. *Id.* Hall moved for a mistrial based on Milligan not being present to testify. *Id.* The trial court denied the motion. *Id.*

### iii. The Kentucky Supreme Court's Decision

Both Edmonds and Hall appealed the trial court's rulings as to Milligan's identification testimony. The Kentucky Supreme Court held the statements were hearsay but that "because Hall had confessed in multiple statements that he was present at the crime, though claiming varying degrees of involvement, there is no reasonable basis to believe that the statements had a substantial effect on the verdict against Hall since they did little more than place him at the scene." *Edmonds I*, 2009 WL 4263142, at *6. As to Edmonds, the Kentucky Supreme Court noted the admission of Milligan's statements was actually favorable to him, as he was the party who initially sought their admission. *Id.* Though the statements were hearsay, the Court concluded these errors were harmless. *Id.*

### iv. Edmonds' Claim on Habeas Review

Edmonds argues that the trial court's exclusion of Milligan's exculpatory, non-identification testimony violated the due process clause pursuant to *Chambers v. Mississippi*, 410 U.S. 284 (1973). (DN 67, at PageID # 1171). Edmonds claims that the trial court's mechanistic application of the Kentucky hearsay rules, despite the importance of the evidence to his ability to provide a complete defense, was far from harmless and raises grave doubts about his verdict. (*Id.*).

The Warden argues that the cases Edmonds relies on are distinguishable from the circumstances here and that Edmonds has not pointed to any clearly established federal law that the trial court or the Kentucky Supreme Court violated. (DN 72, at PageID # 1362). Specifically, the Warden highlights that Milligan's statements to police did not per se exclude Edmonds as the second assailant at the scene because Milligan merely stated that he couldn't identify the second male. (*Id.* at PageID # 1361). The Warden notes that even if error occurred, it was harmless, because the evidence against Edmonds was overwhelming and the hearsay testimony from Milligan that was allowed at trial was helpful to Edmonds. (*Id.* at PageID # 1363). The Warden concludes that Edmonds' speculation that his trial outcome would have been different had Milligan's non-identification of him been admitted does not equate to a due process violation. (*Id.*).

Edmonds' reply emphasizes that identification was a key issue in this case, which makes exclusion of Milligan's testimony harmful error. (DN 76, at PageID # 1417 (citing *Pettijohn v. Hall*, 599 F.2d 476 (1st Cir. 1979)). Had the jurors been presented with Milligan's non-identification testimony, Edmonds contends that they could have either concluded that a different individual committed the crime or, at a minimum, that co-defendant Hall's testimony about Edmonds' involvement was too unreliable to sustain a guilty verdict. (*Id.*). Edmonds maintains

this error cannot be considered harmless because the allegedly "overwhelming" evidence of his guilt is inaccurate. (*Id.* at PageID # 1417).

As an initial matter, although the Warden recognizes the Sixth Circuit's directive that this claim be evaluated de novo, he repeatedly cites to and relies on the standards of AEDPA in opposing Edmonds' claim. (*See* DN 72, at PageID #1355, 1357). The Court, therefore, will not consider the Warden's arguments that the Kentucky Supreme Court unreasonably applied clearly established federal law as to Edmonds' witness-identification claim.

Turning to the substance of Edmonds' claim, a defendant's right to present a meaningful and complete defense is a well-established and fundamental tenet of due process. *See Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); *Chambers*, 410 U.S. at 302. This right, however, is not absolute. *Vesey v. McQuiggin*, 587 F. App'x 966, 972 (6th Cir. 2014). The defendant still "must comply with established rules of procedure and evidence designed to assure both fairness and reliability." *Chambers*, 410 U.S. at 302.

As discussed above, the defendant in *Chambers* challenged the trial court's exclusion of third-party culpability evidence as hearsay. The Court found that because the third-party statements "bore persuasive assurances of trustworthiness[,]" were "critical to Chambers' defense," and implicated "constitutional rights directly affecting the ascertainment of guilt[,]" the hearsay rule could not be applied mechanistically "to defeat the ends of justice." *Id.* Ultimately, the Court concluded that the exclusion of critical evidence, combined with the trial court's refusal to permit the defendant to cross-examine the culpable third-party, "denied him a trial in accord with traditional and fundamental standards of due process." *Id.* The Court emphasized that its holding did not signal any diminished respect for a state court's ability to establish and implement

criminal trial rules and procedures but that "under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial." *Id.* at 302-03. Again, the Supreme Court has clarified that *Chambers*' holding is very narrow and, if anything, *Chambers* indicates that erroneous evidentiary rulings may rise to the level of a due process violation. *Egelhoff*, 518 U.S. at 52-53.

There are several marked distinctions between *Chambers* and the instant case. First, Milligan's statements were not a confession of involvement in the attack on Agnew. Milligan's non-identification of Edmonds is significantly weaker evidence than the excluded third-party confessions that the Supreme Court in *Chambers* and the Sixth Circuit in *O'Neal v. Balcarcel*, 933 F.3d 618, 625-26 (6th Cir. 2019) found violated due process.[4]

Next, while Milligan's failure to identify Edmonds as one of the two individuals he witnessed at the crime scene could have helped bolster Edmonds' defense that he was a minimal participant in the attack, it was not a crucial factor in establishing Edmonds' defense. Milligan's statement to law enforcement identifying Hall as one of the two assailants in the alley was based on his previous interactions with Hall at the Salvation Army. But Milligan did not definitively exclude Edmonds as the other individual. Rather, when officers asked Milligan what the second individual looked like, he responded: "I couldn't see him." (DN 67-1, at PageID # 1276). Later in the interview, officers asked Milligan if he'd ever seen the second individual before, to which Milligan reiterated: "I couldn't identify him." (*Id.*, at PageID # 1285). This vague information does not establish that Edmonds was or was not the second individual; it merely establishes that

_____

4 In *O'Neal*, the Sixth Circuit highlighted that confessions are unlike any other evidence in that it "come[s] from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct." 933 F.3d at 625-27 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991)).

Milligan was unable to identify the second individual in the dark alley after being shown a photo lineup.

Edmonds tries to bolster the importance of Milligan's non-identification by claiming that identification was a key issue in the case. To the extent that Hall and Edmonds' joint trial required the jury to determine each defendant's role in the attack, the Court agrees that identification was a key issue. But Milligan's statements would not have necessarily shown the jury that Edmonds was not the individual that participated in attacking Agnew in the alley or that if he was the second individual in the alley, he was a minimal participant. Perhaps Milligan's statements would have further strengthened Edmonds' defense. But the question before the Court is only whether a fairminded jurist could believe that Edmonds was able to put on a "meaningful" defense even without Milligan's testimony. The Court finds he was.

Another fact that distinguishes Edmonds' circumstances from those in *Chambers* and *O'Neal* is that Milligan went missing before trial and was unavailable to testify to his previous statements. The *Chambers* Court considered the fact that the trial court refused to permit the defendant to cross-examine the culpable third-party in finding defendant had been deprived of a fair trial. 410 U.S. at 302. In *O'Neal*, the defendant cross-examined the culpable third-party, but was not permitted to inquire regarding the third-party's jailhouse confession. 933 F.3d at 622, 626-27. Milligan's unavailability to testify regarding his prior statements to law enforcement reinforces that the trial court did not apply its hearsay rule "mechanistically" to defeat the ends of justice. Rather, the trial court applied the hearsay rule properly for its historic purpose: to exclude statements of dubious reliability that cannot be tested by cross-examination.

Edmonds' circumstances further depart from *Chambers* and *O'Neal* because Milligan's

32

testimony would have affected Edmonds and his co-defendant Hall differently. Milligan's testimony specifically implicated Hall, meaning that Edmonds would have to additionally address Hall's confrontation rights against Milligan for the testimony to be admissible. This added layer compounds Edmonds' ability to prove constitutional error in the trial court's evidentiary ruling.

Edmonds attempts to undercut this conclusion by arguing Milligan was a reliable and trustworthy witness. He points out that Milligan was a disinterested eyewitness to the crime, that he gave his statements to law enforcement shortly after the attack occurred, and that his statements were consistent with other evidence offered at trial. (DN 67, at PageID # 1176-77). Milligan's reliability further cannot be disputed, Edmonds asserts, because the prosecution presented Milligan's statements to the grand jury to obtain indictments against Hall and Edmonds. (*Id.* at PageID # 1167).

While Milligan's testimony offers certain indicia of reliability, most notably, the temporal proximity between his observations and his statement to law enforcement and his impartiality, the specific testimony that Edmonds wanted introduced was vague. Milligan's statements that he did not see and could not identify the second individual do not definitively help Edmonds' case. Some indicia of reliability in Milligan's statements does not alone render the trial court's application of the hearsay rule a due process violation. And, as for the presentation of Milligan's statement to the grand jury, the Court notes that Kentucky's rules of evidence do not apply to grand jury proceedings. *See* Ky. R. Evid. 1101(d)(2).

Milligan's excluded hearsay testimony is simply not of the same ilk of those limited cases where federal courts have determined that a state court's evidentiary ruling violated a habeas petitioner's federal constitutional rights. The facts and circumstances surrounding the trial court's

exclusion of Milligan's non-identification of Edmonds as hearsay do not compel the conclusion that Edmonds was denied due process.

But even if the trial court's exclusion of Milligan's identification testimony could be considered constitutional error, such error is harmless under the *Brecht v. Abrahamson* standard. Pursuant to *Brecht*, a federal court will not grant habeas relief unless the state error "resulted in 'actual prejudice.'" 507 U.S. at 637 (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)). A constitutional error is harmless if the habeas court is satisfied it did not have a 'substantial and injurious effect or influence in determining the . . . verdict." *Id.* at 637-38 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

The potential error here did not result in actual prejudice to Edmonds. There was ample evidence upon which to convict Edmonds. The Court determined above that it was not unreasonable for the Kentucky Supreme Court to classify the evidence of Edmonds' guilt as overwhelming. Moreover, some of Milligan's testimony, specifically that which identified Hall as one of the attackers, was introduced at trial despite the trial court's pre-trial exclusion of such hearsay. As the Kentucky Supreme Court noted, Milligan's testimony about Hall being introduced was favorable to Edmonds. Because the jury was made aware that Milligan identified Hall at the scene, the jury could have determined that the second individual was or was not Edmonds based on the other evidence presented. The additional introduction of Milligan's statements that he could not identify the second individual at the crime scene would not have had a substantial effect on the jury's verdict.

### D. Edmonds' Claim of Cumulative Error

Edmonds asserts throughout his brief that the prejudicial impact of Thomas' improper

victim-impact testimony and the exclusion of Milligan's exculpatory testimony should be considered cumulatively. (*See* DN 67, at PageID # 1164, 1179). According to Edmonds, the harmful effect of these combined errors on the verdict is undeniable. (*Id.* at PageID # 1179). Edmonds recognizes that cumulative error claims are not cognizable under AEDPA in the Sixth Circuit but distinguishes his claims as outside of AEDPA.

Edmonds correctly identifies that in the Sixth Circuit "cumulative error claims are not cognizable on habeas." *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006). That is because the Supreme Court "has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief." *Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006) (quoting *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002)). Here, even if the Court entertained Edmonds' cumulative error claim on de novo review, the underlying claims have already been shown to be without merit, such that no cumulative error could exist. *See Keith*, 455 F.3d at 679 (holding that where individual claims are all essentially meritless, cumulative error cannot be shown); *see also Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000). And while *Chambers* and *Egelhoff* contemplate that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation, the evidentiary rulings here did not implicate the same concerns as those cases. Edmonds, accordingly, is not entitled to habeas relief based on the combined effect of the alleged errors.

### E. Certificate of Appealability

The final inquiry is whether Edmonds is entitled to a Certificate of Appealability ("COA") pursuant to 28 U.S.C. § 2253(c)(1)(B) on either of the grounds raised in his habeas petition. When the Court rejects a claim on the merits, the petitioner must demonstrate that reasonable jurists

would find the Court's assessment of the constitutional claim debatable or wrong for this Court to issue a COA. *Slack v. McDaniel,* 529 U.S. 473, 484 (2000).

Here, neither of the grounds raised by Edmonds could be reasonably debated. The Kentucky Supreme Court's harmless error determination regarding Thomas' victim-impact testimony aligns with the controlling precedent of the United States Supreme Court in *Payne, Chambers, Booth,* and *Brecht.* Edmonds does not demonstrate that these decisions would call the adjudication of his claim into question. The Court, therefore, does not recommend a COA issue as to Edmonds' victim-impact-testimony claim.

Nor does the Court find that reasonable jurists would debate the Court's de novo analysis of Edmonds' witness-identification claim. Edmonds' claim is distinguishable from the Supreme Court's holding in *Chambers*, on which Edmonds relies. Edmonds has not made a substantial showing of the denial of a constitutional right in this claim. The Court again recommends a COA be denied.

### III. Recommendation

For the foregoing reasons, the Court **RECOMMENDS** that Edmonds' petition for writ of habeas corpus (DN 1; DN 67) be **DENIED**. The Court further recommends that a Certificate of Appealability be **DENIED** as to both of Edmonds' claims.

Regina S. Edwards, Magistrate Judge
United States District Court

February 3, 2022

<u>NOTICE</u>

Therefore, under the provisions of 28 U.S.C. Sections 636(b)(1)(B) and (C) and Fed.R.Civ.P. 72(b), the Magistrate Judge files these findings and recommendations with the Court and a copy shall forthwith be electronically transmitted or mailed to all parties.   Within fourteen (14) days after being served with a copy, any party may serve and file written objections to such findings and recommendations as provided by the Court.   If a party has objections, such objections must be timely filed or further appeal is waived.   <u>Thomas v. Arn</u>, 728 F.2d 813 (6th Cir.), <u>aff=d</u> U.S. 140 (1984).

Copies:          Counsel of Record